# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Adrian Bombin and Samantha Rood, on behalf of themselves and all others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>Southwest Airlines Co.,<br><br>　　　　　　　　　　Defendant. | Case No. 5:20-cv-01883-JMG |

# DEFENDANT'S MOTION TO EXCLUDE
# TESTIMONY OF CHRISTOPHER J. BENNETT UNDER *DAUBERT*

108747504.2

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ......................................................................................................................... 5

    I.    Dr. Bennett's Damages Methodology Is Irrelevant and Unreliable Because It Is Contrary to the Measure of Damages Recoverable at Law. ........................... 5

    II.   Dr. Bennett's Class-wide Damages Methodology Is Unreliable Because It Assesses Damages on Behalf of Uninjured Class Members. ................................ 8

    III.  Dr. Bennett's Methodology Does Not Reliably Identify Class Members. .......... 10

CONCLUSION .................................................................................................................... 11

# **INTRODUCTION**

In connection with their motion for class certification, ECF Doc. 71 ("Cert. Memo."), Plaintiffs seek economic damages on behalf of a putative class. In doing so, they rely on the expert report of Dr. Christopher Bennett (the "Bennett Report") to provide purportedly uniform methods of (a) calculating damages that will avoid certification-defeating individual inquiries into the damages allegedly experienced by each putative class member, and (b) identifying individuals who meet the class definition. Dr. Bennett's methodologies are irrelevant and unreliable for several reasons.

First, Dr. Bennett's damage methodology ignores a basic input for calculating contractual damages: the value of what the non-breaching party received from the breaching party. In particular, Dr. Bennett fails to consider the value of the residual travel funds ("RTFs") that each putative class member received from Southwest in lieu of the refunds that Plaintiffs claim were required by Southwest's Contract of Carriage. Dr. Bennett admits that these RTFs have value (Southwest's expert agrees), although he wholly fails to account for their value, and more specifically, how their economic value will vary by class member (as Southwest's expert opines).

Second, Dr. Bennett's methodology cannot reliably compute class-wide damages because it fails to exclude various types of uninjured passengers, and it would instead award those passengers damages to which they are not entitled. For example, Dr. Bennett's methodology does not exclude the following uninjured putative class members:

- Passengers who did not purchase the ticket (and thus would not be the recipient of a refund);

- Passengers who, if presented the option that Plaintiffs claim was required to be presented, would have nonetheless selected an RTF over a refund; and

- Passengers who accepted revised itineraries following a schedule change but then at a later point cancelled their flights for reasons unrelated to the schedule change.

Third, Dr. Bennett's methodology for identifying individuals who meet the class definition is overinclusive. He identifies numerous individuals, falling into three distinct categories, that simply fail to meet the class definition, as Southwest's expert explains.

For these and the additional reasons set forth below, the Court should exclude Dr. Bennett's opinions and testimony under Federal Rule of Evidence 702 and not rely on it in ruling on the motion for class certification.

## **BACKGROUND**

Plaintiffs have moved to certify a class of Southwest passengers who Plaintiffs contend were entitled to notification of the option to obtain a refund when Southwest canceled or changed the passengers' flights during the early months of the COVID-19 pandemic. *E.g.*, Cert. Memo. at 1–3. Plaintiffs' proposed class does not comprise all Southwest passengers affected by cancellations or changes during this time period, but rather is limited to passengers who received residual travel funds ("RTFs") from Southwest. *Id.* at 3. These RTFs were equivalent to the fare amount paid for a ticket on the affected flight and could be used by the passenger for travel on a future Southwest flight. *E.g.*, Ex. 3, Expert Report of Darin Lee ("Lee Report") ¶¶ 7(a), 11. On behalf of the putative class, Plaintiffs seek "compensatory damages" in the form of "a refund to the original form of payment and interest." Cert. Memo. at 17.

Tacitly acknowledging that individualized issues in calculating compensatory damages would defeat certification, Plaintiffs assert that they "will prove class-wide damages through a uniform methodology." *Id.* at 17. Their memorandum in support of certification is silent on how they will do so, other than citing the Bennett Report.[1]

---

[1] The Bennett Report was filed as ECF No. 72, but it is attached to this Motion as Ex. 1 for the Court's convenience.

The Bennett Report offers a simplistic damage model with two components: (i) a refund component and (ii) an interest component. It is set forth as follows:

> The economic damages to each Class member consist of two parts: (i) the money paid for the tickets associated with their Affected Flights that has not been refunded (the "Refund Amount"); and (ii) accrued interest on the Refund Amount using a simple interest rate of five percent per annum from the day on which Southwest issued the RTF for the Affected Flight through the day on which either Southwest issued/s the Refund Amount or the Court issues its judgment (the "Accrued Interest").

Bennett Report ¶ 57. So, for example, if Passenger "John Doe" paid $200 for a one-way ticket from Philadelphia to Miami, his flight was cancelled by Southwest, and he was issued a $200 RTF after the cancellation, then Dr. Bennett would calculate John Doe's damages at (i) $200, plus (ii) the interest on that $200 (from the date the RTF issued through judgment). *See id.* ¶¶ 57–59.

In his damage calculation, Dr. Bennett does not consider the value of the RTF received by the passenger. Ex. 2 ("Bennett Depo.") at 61:20–21; *see also* Bennett Report ¶¶ 57–60. When deposed, however, Dr. Bennett agreed that RTFs "have value," even though "the dollar amount associated with the residual travel fund," in his view, "is not necessarily the same as the economic value of residual travel fund." Bennett Depo. 56:5–8, 61:8–12; *see also id.* at 58:16–22 ("[T]here can be economic value associated with the residual travel fund. . . . I would agree that it's not valueless.").

Southwest's expert agrees that not only do RTFs have value, but their economic value will vary by class member. Lee Report ¶¶ 53–59; *see also* Bennett Depo. 62:21–64:21 (noting that he has not considered whether the economic value varies by class member, but acknowledging that "may or may not be true"). Some passengers may actually place a higher value on RTFs than a refund to the original form of payment. Lee Report ¶¶ 53–59. As Southwest's expert explains, there are at least five circumstances in which an individual would prefer an RTF over a refund (or at least be indifferent between the two):

- 3 -

- ***Windfalls for Non-Purchaser Passengers.*** The class is limited to "passengers." Passengers who did not purchase their ticket stand to gain from choosing an RTF over a refund. Indeed, because RTFs are issued to passengers whereas refunds are issued to the form of payment on file, the choice for non-purchaser passengers is effectively between receiving something (an RTF) and personally receiving nothing. For example, a college student whose parents paid for his/her ticket to come home might choose an RTF to gain autonomy in selecting travel to an entirely different destination—with or without parental permission. Lee Report ¶ 27.

- ***Low Transaction Cost to Use RTF.*** Passengers for whom receiving an RTF has a low or even negligible administrative/transactional cost may choose an RTF over a refund. For example, passengers who plan to travel but needed a short period of time to coordinate with their traveling companions before committing to the new dates of travel might well choose an RTF since redeeming the RTF is as easy as paying by credit card. Likewise, passengers who frequently fly on Southwest may choose an RTF because of their frequent opportunity to redeem the RTF. *Id.*

- ***High Transaction Costs of Refunds.*** Passengers for whom receiving a refund includes high administrative/transactional costs may choose an RTF instead of a refund. For example, passengers who have been reimbursed for their ticket by a third party may choose an RTF to avoid the administrative and logistical inconvenience of voiding or reversing the third-party reimbursement. In some circumstances, the administrative/transactional cost is prohibitive (e.g., canceled credit card). *Id.*

- ***Securing Loyalty Points and Status.*** Passengers aspiring to achieve Southwest Companion Pass status that purchased their tickets with the Southwest Rapid Reward Visa Card may have preferred to have an RTF rather than a refund, since cardholders receive three Rapid Rewards points per dollar spent on Southwest, all of which can be applied toward the 125,000 qualifying points needed to earn a Companion Pass. *Id.*

To be sure, for some passengers the value of RTFs will be less than the value of a refund. But even in those situations, the RTFs still have some value. *Id.* ¶ 53. As Dr. Bennett acknowledged, they are "not valueless." Bennett Depo. 58:16–22. And even for an RTF that ultimately expires, there is some economic value to the passenger having had the right to use the RTF for a given period of time (which, as of this filing, would be over two years for most class members). Lee Report ¶ 57. As noted above, Dr. Bennett's damage methodology does not account for the value of the RTF in any way, and thus he "does not subtract [the RTF's value] from the refund amounts and the accrued interest component." Bennett Depo. 66:14–67:6.

**LEGAL STANDARD**

Expert testimony is admissible under Rule 702 only when the proponent establishes that the evidence satisfies three requirements: qualification, reliability, and fit. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (noting the burden of establishing admissibility by a preponderance of the evidence is on the proponent). To satisfy the "fit" element, the expert's testimony "must be relevant for the purposes of the case and must assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 835 (3d Cir. 2020); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (requiring "connection to the pertinent inquiry as a precondition to admissibility").

This Court must conduct a "rigorous" *Daubert* analysis where challenged expert testimony is critical to proving class certification under Rule 23. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). This means "a plaintiff cannot rely on challenged expert testimony to demonstrate conformity with the requirements of class certification unless the plaintiff also demonstrates that the expert testimony satisfies the standard set out in *Daubert*." *Id*.

**ARGUMENT**

**I.    Dr. Bennett's Damages Methodology Is Irrelevant and Unreliable Because It Is Contrary to the Measure of Damages Recoverable at Law.**

"Expert opinions that are contrary to the law are inadmissible" because they "cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact," and thus do not satisfy Rule 702's admissibility requirements. *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 803 (N.D. Ill. 2005), *amended*, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005); *see also Lamar Advert. Co. v. Zurich Am. Ins. Co.*, 533 F. Supp. 3d 332, 344 (M.D. La. 2021) (expert testimony based on incorrect statements of the law or that represent a "fundamental misunderstanding" of

the law "on a critical part of the case" is inadmissible). Thus, when an expert purports to calculate damages, his opinion is inadmissible where it does not adhere to a damage measure recognized at law. *Loeffel,* 387 F. Supp. 2d at 803–04.

The "universal rule" under Texas law[2] for measuring damages for a breach of contract claim is "just compensation for the loss or damage actually sustained," and a party should be awarded "neither less nor more than [its] actual damages." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). Texas courts recognize three mutually exclusive categories of damages that fall within this universal rule: expectancy, reliance, and restitution damages. *DDR DB Stone Oak, LP v. Rector Party Co., LLC*, 2017 WL 6032541, at *4 (Tex. App. Dec. 6, 2017) (noting three types of damages); *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 515-16 (Tex. App. 2018) (noting that a party "is not entitled to recover on both theories [of expectancy and reliance damages]; to do so is considered equivalent to a 'double recovery.'").

The compensatory damages sought by Plaintiffs—a refund to the original form of payment—are expectancy damages because their purpose is to put passengers in the same economic position as they would have been in had Southwest complied with what Plaintiffs contend were its contractual obligations. *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 112 (Tex. App. 2011) (describing the damage categories and noting that "the purpose of expectancy damages is to restore the non-breaching party to the same economic position that it would have been in had the contract not been breached"); *Atrium Med. Ctr., LP v. Houston Red C LLC*, 595 S.W.3d 188, 193 (Tex. 2020) ("Expectancy damages award a contract plaintiff the benefit of its bargain."). The standard for measuring expectancy damages is "the difference between [1] the value as represented and [2] the value as received." *Sacks v. Hall*, 481 S.W.3d 238, 246 (Tex. App. 2015).

---

[2] It is undisputed that the Contract of Carriage calls for the application of Texas law. *See, e.g.*, Cert. Memo. at 5 (reciting Texas law for elements of Plaintiffs' breach of contract claim).

Dr. Bennett fails to account for the second aspect of this damage measure: the value as received. Although his damages methodology accounts for the value as represented (i.e., the amount of a refund), he does not subtract the value received (i.e., the value of the RTF). Were the value of an RTF $0, this omission might make sense. But the value of an RTF is not $0. Indeed, Dr. Bennett admitted that RTFs have value. Bennett Depo. 58:16–22. In fact, depending on the person, the value of an RTF may exceed the fare's full price, such as in the four circumstances noted above. Lee Report ¶¶ 27, 53–59. As a matter of economics and law, the harm to passengers cannot be measured without accounting for the value of the RTF received by passengers, which value is necessarily individualized. Lee Report ¶¶ 53–59; *Sacks*, 481 S.W.3d at 246.

By failing to account for the value of the RTF, if Plaintiffs prevail in this case, and were to recover the fare's full price with interest in addition to the RTF they had previously been given, they would recover more than their actual damages, which is impermissible in Texas law on expectancy damages. *See Phillips*, 820 S.W.2d at 788. Indeed, such damages would improperly put Plaintiffs and the class in a better position than if the contract had been performed. *See Emps. Ret. Sys. of Texas v. Putnam, LLC*, 294 S.W.3d 309, 321 (Tex. App. 2009).

*Loeffel*, *supra,* addressed precisely the situation before this Court, and held the expert testimony to be inadmissible. *Loeffel* involved breach of warranty and fraud claims, both of which had the same measure of damages: the difference between the value as received and the value as warranted or represented. 387 F. Supp. 2d at 804–05; *see also id.* at 806 (discussing the "benefit of the bargain rule" for damages). The expert's "assessment of economic loss necessarily omitted any consideration of the difference between the value of the [product] as warranted and its diminished value resulting from the [product's] flaws." *Id.* at 805. The expert's testimony was thus inadmissible. *Id.* at 822. So too here: Dr. Bennett failed to consider the difference between

the value of RTFs as received by particular putative class members, and his testimony is thus inadmissible.

**II.  Dr. Bennett's Class-wide Damages Methodology Is Unreliable Because It Assesses Damages on Behalf of Uninjured Class Members.**

Class-wide damages models that assess damages to uninjured class members are not reliable or admissible. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 143–44 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 387 (D.R.I. 2019) (excluding expert opinion that did "not purport to provide a method for excluding uninjured consumers" after noting that "in order to prevail on its motion for class certification, the class action plaintiff must provide a plan to identify and remove any uninjured entities and/or persons from the class in a manner that is both administratively feasible and protective of the defendant's Seventh Amendment and due process rights." (citing *In re Asacol Antitrust Litigation*, 907 F.3d 42, 52 (1st Cir. 2018))).  Dr. Bennett is "not offering an opinion about whether individuals were injured or not." Bennett Depo. 192:23–25.  He thus calculates class-wide damages on behalf of all putative class members and makes no attempt to identify and exclude uninjured class members from his methodology.

At least three categories of class members exist who have no injury.[3]  First, passengers who did not purchase the ticket (and thus would not be the recipient of a refund) sustained no injury. Indeed, they are better off as a result of the alleged breach.  Lee Report ¶¶ 27–28.  Each of those passengers has something of value (an RTF), whereas a refund to the original form of payment would not result in a refund to those non-purchasing passengers.  *Id.*  Second, passengers who, if notified of the refund option that Plaintiffs claim was required to be presented, would have

---

[3] These three situations are also discussed in Southwest's Opposition to Plaintiffs' Motion for Class Certification, and further argument on them is incorporated by reference.

nonetheless selected an RTF sustained no injury. Those passengers now have exactly what they would have had if Southwest had complied with the purported notification obligation (i.e., an RTF). *See Geis*, 362 S.W.3d at 112 ("the purpose of expectancy damages is to restore the non-breaching party to the same economic position that it would have been in had the contract not been breached"). Third, those passengers who experienced a schedule change, accepted the schedule change, but then cancelled weeks or months later for reasons unrelated to the schedule change (e.g., fear of flying during the pandemic, event at their destination was cancelled) received an RTF, but they received that RTF as a result of their own decision to self-cancel a flight, not as the result of any schedule change by Southwest. Lee Report ¶ 49 (discussing this issue and noting examples of individuals who cancelled many weeks after the schedule change). Dr. Bennett admitted that his methodologies developed for this case do not account for these situations. Bennett Depo. 115:14-116:14, 117:14-23 (whether passenger was purchaser); *id.* at 147:25-151:13, 217:23-218:25 (offered refund but selected RTF); *id.* at 138:9-139:13, 141:9-144:24 (self-cancellation).

Likewise, Dr. Bennett's methodology does not account for individuals whose claim to interest would be terminated by Southwest having cured any alleged breach. More specifically, Plaintiffs contend Southwest breached the Contract of Carriage because it "fail[ed] to offer the option of a monetary refund when it Cancelled or Changed Class Members' [WGA] tickets." Cert. Memo. at 20; *see also id.* at 18. To the extent this is even a breach,[4] Southwest indisputably cured the purported breach as to at least some class members. For example, on June 2, 2020, it informed over 15,000 individuals by e-mail of the availability of refunds in connection with cancelled international flights. Lee Report 13; Ex. 4, Michelle Buckley Declaration, ¶ 4. Dr. Bennett's

---

[4] In Southwest's Opposition to the Motion for Class Certification, it explains why there is no obligation to notify passengers of the option of a refund.

methodology does not account for these individuals; indeed, he was not even aware of these facts. Bennett Depo. 210:16–213:15.

Without a mechanism for removing uninjured passengers and accounting for passengers whose breach was cured, Dr. Bennett cannot reliably calculate class-wide damages for injured class members. His opinions on a class-wide damage methodology are therefore inadmissible.

**III.     Dr. Bennett's Methodology Does Not Reliably Identify Class Members.**

In addition to purporting to develop a methodology for awarding damages, Dr. Bennett attempts to develop a methodology for identifying individuals who meet the class definition. Specifically, based on a sample of data from 28 flights, Dr. Bennett purports to identify 84 class members, and thus Dr. Bennett opines that he could identify all class members with access to full flight data. Bennett Report ¶¶ 4, 54. His methodology is grossly overinclusive, however, as Southwest's expert has shown that 32 of those 84 purported class members do not actually meet the class definition in at least one of three ways. Lee Report ¶¶ 71–73. What's more, the class is limited to persons residing in the United States, and Dr. Bennett makes no attempt to identify those individuals. *Id.* ¶ 74.

First, Dr. Bennett's damages model is overbroad in that it incorrectly identifies as putative class members individuals who were first issued tickets on affected flights *after* Southwest changed the flight. *Id.* ¶ 71. These individuals do not meet the requirements of Plaintiffs' class definition (and separately are not economically harmed by Southwest's actions). *Id.* And despite his claiming that his model excludes these individuals, Bennett Depo 159:8-160:2, Southwest's expert has identified 10 individuals who were first issued tickets for their flights *after* the Southwest schedule change. *Id.*

Second, Dr. Bennett incorrectly identifies as putative class members individuals who voluntarily removed themselves from flights *before* Southwest canceled or changed their flights.

*Id.* ¶ 72. Dr. Bennett conceded this error in his deposition and admitted that his model should account for the "date the RTF was issued relative to the date of the scheduled or affected flight." Bennett Depo. 16:24-17:14; Lee Report ¶ 72. But having received no correction to the methodology, Southwest's expert has identified 19 of the 84 purported class members who had RTFs issued *before* the cancelation or change date—some by as much as 31 days. *Id.*

Third, Dr. Bennett's model also includes passengers whose tickets changed to different flights *before* Southwest canceled or changed the affected flights. *Id.* ¶ 73. Three additional individuals that Dr. Bennett claims are members of the class fit this description. *Id.* For example, there were two passengers scheduled on the affected SJC-HNL flight who had flights for travel from Dallas to Honolulu connecting in San Jose (SJC). *Id.* In December 2019, more than three months before the affected flight was canceled, these passengers switched to a connection in Oakland (OAK), and were not on the affected flight at the time of cancelation. *Id.*

Finally, the class is limited to "passengers residing in the United States." Cert. Memo. at 3. Dr. Bennett testified that "residency is not a condition that I'm verifying as part of this – the algorithm described in my report." Bennett Depo. 192:18-25.

For these reasons, Dr. Bennett cannot reliably identify individuals who meet the class definition. His opinions in this respect should therefore be excluded.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the court grant this Motion and exclude Dr. Christopher J. Bennett's opinions and testimony.

Date: June 13, 2022                    /s/ *James V. Leito IV*
                                        Michael A. Swartzendruber
                                        Texas State Bar No. 19557702
                                        michael.swartzendruber@nortonrosefulbright.com
                                        James V. Leito IV
                                        Texas State Bar No. 24054950
                                        james.leito@nortonrosefulbright.com
                                        NORTON ROSE FULBRIGHT US LLP
                                        2200 Ross Avenue, Suite 3600
                                        Dallas, TX 75201-7932
                                        Tel: (214) 855-8000
                                        Fax: (214) 885-8200

                                        Todd A. Noteboom
                                        STINSON LLP
                                        50 South Sixth Street, Suite 2600
                                        Minneapolis, MD 55402
                                        Tel: (612) 335-1894
                                        todd.noteboom@stinson.com

                                        M. Roy Goldberg
                                        STINSON LLP
                                        1775 Pennsylvania Avenue, N.W., Suite 800
                                        Washington, D.C. 20006
                                        Tel: (202) 728-3005
                                        roy.goldberg@stinson.com

                                        James T. Moughan
                                        BENNETT BRICKLIN & SALTZBURG LLC
                                        Centre Square West Tower, 32nd Floor
                                        1500 Market Street
                                        Philadelphia, PA 19102
                                        Tel: (215) 665-3402
                                        Fax: (215) 561-6661
                                        moughan@bbs-law.com

                                        ***Attorneys for Defendant Southwest Airlines Co.***

- 13 -

## CERTIFICATE OF SERVICE

I, James V. Leito IV hereby certify that a true and correct copy of the foregoing Motion to Exclude Testimony of Christopher J. Bennett Under *Daubert* was filed electronically and was made available for viewing and downloading via the Court's CM/ECF system, and all counsel of record was served via the court's CM/ECF system notification.

Dated: June 13, 2022                          /s/ *James V. Leito IV*
                                                              James V. Leito IV